J-S36019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.L.E., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.L.H., MOTHER | : : : : : : : | |
| | : | No. 758 WDA 2025 |

Appeal from the Order Entered May 22, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 63 of 2024

BEFORE: PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:         **FILED: January 22, 2026**

R.L.H. (Mother) appeals from the order terminating her parental rights to K.L.E. (Child) and granting the petition filed by W.A.J. and A.J.J.[1] (collectively, Petitioners). On appeal, Mother argues that Petitioners failed to establish grounds to terminate Mother's parental rights by clear and convincing evidence. We affirm.

The trial court set forth the facts as follows:

[Child] and her twin brother were born in August [of] 2020. Father and Mother resided together with Child and her brother. In December [of] 2020, [Child's] brother tragically died as a result of [Child's father, B.W.E. (Father),[2]] dropping the brother while

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] A.J.J. is Mother's first cousin. *See* N.T., 4/10/25, at 182.

[2] The trial court terminated Father's parental rights to Child in the same order that terminated Mother's rights.

feeding him. [Child's] brother suffered detached retinas, brain injuries and had healing rib fractures. Fayette County Children and Youth Services [(the Agency)] took custody of [Child] as a result of her brother's death. It was discovered that [Child] had bruising on her head and healing rib fractures like her brother. [Child] was placed with Petitioners on February 11, 2021, through kinship foster care. The [Agency] case was closed on March 23, 2023 due to a subsidized permanent legal custodianship [(SPLC)] arrangement with Petitioners.[3]

Petitioners have had custody of [Child] since February [of] 2021. Prior to the placement with Petitioners, Father had supervised visits with [Child] on approximately three [] occasions, which ended in January [of] 2021 due to Father's incarceration on criminal charges related to the death of his son.[FN1] After being released from incarceration pending his criminal trial in July [of] 2021, Father resumed supervised visits [with Child] through Justice Works and would see [Child] weekly for approximately three [] hours. In October [of] 2021, Father was permitted to have nonprofessional supervised visits every Sunday, and then eventually every Sunday and an additional day during the week, with the paternal grandmother serving as supervisor. After [the Agency] closed its case in March [of] 2023 due to the [SPLC], Petitioners allowed Father to continue his supervised visitation. However, Father's visits were continually decreased in time by Petitioners. The visits ended in June [of] 2023 when [Child] returned from a visit and had bloody fingernails from being clipped too short. During this time, Mother did not have any visits due to safety concerns as a result of [Child] returning with injuries during a previous period of time [when] Mother had overnight visits.

[FN1] In March 2025, Father was acquitted on all charges after a jury trial in Fayette County.

In June [of] 2023, Father filed a custody action in Westmoreland County. In August [of] 2023, an interim order was entered by the custody court which granted Father and Mother supervised

---

[3] A subsidized permanent legal custodianship is "[a] court-ordered disposition of a dependent child under 42 Pa.C.S § 6351(a)(2.1) for which the child's permanent legal custodian receives a monetary payment from the county agency pursuant to [a written] agreement [between the agency and custodian]." 67 Pa.C.S. § 7502 (definitions).

physical custody through Alternative Community Engagement Solutions, LLC [(ACES)]. . . .

A custody conciliation conference was held in September [of] 2023 and a final custody order was entered which continued Mother's supervised physical custody through ACES.

\* \* \*

Mother started her periods of supervised custody in December [of] 2023. Mother was initially scheduled to have one visit per week. Between December [of] 2023 and June [of] 2024, Mother attended a total of six of the [thirty-five] offered visits. Mother received a grant to pay for the supervised visits. The dates of the visits were December 30, 2023[;] January 3, 2024[;] February 28, 2024[;] April 24, 2024[;] May 8, 2024[;] and June 19, 2024.

Trial Ct. Op. & Order, 5/22/25, at 1-4.

Petitioners filed a petition to involuntarily terminate Mother's and Father's parental rights to Child on July 3, 2024. The trial court held a termination of parental rights (TPR) hearing on April 10, 2025. At the TPR hearing, Mother was represented by Randall Klimchock, Esq., and Child's best interests and legal interests were dually represented by Patricia Elliott-Rentler, Esq., after the trial court "determined that Attorney Elliott-Rentler could represent both interests upon [counsel's] representations . . . based on her contact with [Child], [Child's] tender age and [Attorney Elliott-Rentler's] longstanding involvement with the family[.]" Trial Ct. Op. & Order, 5/22/25, at 1; *see also* N.T., 8/21/24, at 4; N.T., 4/10/25, 3-4.[4]

_____

[4] Attorney Elliott-Rentler was called to testify as Child's GAL at the TPR hearing. *See* N.T., 4/10/25, at 281. Therein, Attorney Elliott-Rentler testified that she had also served as GAL in Child's custody case. *Id.*

At the TPR hearing, Savannah Butler, a visitation supervisor at ACES, testified that ACES received a court order on August 2, 2023 to supervise Mother's weekly visits with Child. **See** N.T., 4/10/25, at 6-7. Ms. Butler testified that ACES received a grant payment of $2,000 from "the Blackburn Center" to provide approximately six months of supervised visitation services for Mother. **Id.** at 40, 51-52; **see also** N.T., 4/10/25, Ex. 1, ACES Court Summary, 3/26/25, at 1 (ACES Rpt.). Ms. Butler testified that Mother first contacted ACES in November of 2023 regarding the supervised visits, that ACES was available to supervise Mother and Child during the three-month period between the entry of the custody order and November of 2023, and that Mother did not "offer any explanation for the delay [in requesting supervised visitation] other than transportation." **See** N.T., 4/10/25, at 7-8, 47.

Ms. Butler testified that during her "interactions with [Child] one-on-one or when [A.J.J.] was present, . . . [Child] was a fairly normal – like, would have conversations with me, would play with toys, would show off her light-up shoes. I would say, yeah, she's pretty easy-going." **Id.** at 50. In order to "recreate an attachment or bond" between a parent and child, Ms. Butler explained that it was important for Mother to have consistent visits. **Id.** at 52. Additionally, Ms. Butler testified that prior to the first visit Mother did not appear to understand that Child might be "reticent" to engage with Mother because Child had not had contact with Mother "for an extended period of time," and that it "might be helpful to [Child] to have her primary source of

attachment[, that is, A.J.J.,] present during this sort of reintroduction" to Mother." *Id.* at 47-48.

Ms. Butler testified that during Mother's first supervised visit on December 30, 2023, Mother asked ACES to have A.J.J. leave the room during the visit; however, Child became "visibly upset" when A.J.J. attempted to leave the room, and Child tried "to cling to [A.J.J.], saying she didn't want her to leave." *Id.* at 8-9, 47-48; *see also* ACES Rpt. at 1-2. ACES staff attempted to facilitate this first visit between Mother and Child for "20 to 30 minutes" but Child did not feel "safe or comfortable enough to stay" in the room with Mother without A.J.J. present; therefore, ACES was not able to successfully conduct this first visit. N.T., 4/10/25, at 9, 48; *see also* ACES Rpt. at 2 (stating that after the first visit, Mother "requested that [A.J.J.] remain in the room for the next visit to aid in transitioning [Child] from [A.J.J.] to [Mother]").

Ms. Butler testified that for the next visit with Child on January 3, 2024, Mother requested a three-hour session whereas ACES recommended a one-and-a-half hour visit to "try to work up the three-hour timeframe[,]" given Child's comfort level with Mother during the first visit. N.T., 4/10/25, at 49. The ACES report states that earlier on the day of the visit, Mother had texted Ms. Butler to request that A.J.J. "go back outside" during the visit and that if Child "freaks out and it lasts longer than like 20 minutes, [A.J.J.] can come back inside." ACES Rpt., at 2. Mother asserted, based on her "9 years of experience as a teacher" and "working in quite a few daycares[,]" as well as

her experience with children in general, that "[Child] would not be traumatized" by the proposed plan. *Id.* However, A.J.J. was unable to leave the room as Mother had requested as Child began to cry when she realized that A.J.J. was gone. *Id.* at 3.

Ms. Butler testified that during the visit Mother brought holiday gifts for Child and spent the majority of the session encouraging Child to open gifts. *See id.*; N.T., 4/10/25, at 58. Child, however, repeatedly asked to leave and physically attempted to leave the room. *See* ACES Rpt., at 2-4. Specifically, the ACES report stated:

> [Child] threw [a gift], laid on the ground, and became visibly upset. . . . [When A.J.J.] tried to sneak out the door while [Child] was distracted [with a game suggested by an ACES staffer, Child] started crying and did not want [A.J.J.] to leave. [Mother] stayed seated on the floor and said, 'They have tape all over this,' as she tried to get another present ready for [Child]. This occurred while [Child] was crying and running away.

ACES Rpt. at 3. At the conclusion of the visit, Mother stated to Ms. Butler: "See, [Child] was okay. I knew she would be." *Id.* at 4. Further, Mother complained to Ms. Butler that "[Child] calls [A.J.J.] 'Mom'" and that Mother wanted that "corrected." *Id.* Ms. Butler and another ACES staff member "attempted to explain to [Mother] that, due to [Child's] age, [Child] did not possess the ability to understand abstract concepts . . . [and that] 'Mom' was a concept, and it would be difficult to correct that since [A.J.J.] is the person that fills that role [for Child]." *Id.* However, Mother "resisted the explanations and indicated that the theory was incorrect" and "argued about the subject

for 20 minutes." *Id.* at 4-5. Mother also again requested to have three-hour visits with Child, to which ACES staff responded that it would be "in the best interest of [Child] to take things slow while she readjusted to [Mother]." *Id.* at 5. In response, Mother "implied that if she did not start getting her 3-hour visits at ACES that she would find somewhere else that would." *Id.*

After the January 3, 2024 visit, Ms. Butler testified that Mother "acknowledg[ed] that the visits were not going well" but, when ACES staff "tried to have conversations with [Mother], she communicated in a very self-assured way that she knew what she was doing and that the visits themselves were ridiculous, our feedback was ridiculous . . . when we were trying to offer advice or feedback [to] try to make these more successful." N.T., 4/10/25, at 51.

Ms. Butler testified that by April of 2024, ACES had

reached out to [GAL] because there were so many cancelled visits and because there was such a span between visits[ that w]e were concerned about the success.

It seemed that when the visits were every other week, there was a bit more consistency for [Child] comfortably entering the office, but when there were longer spans of time between visits, she would be upset, and it was like starting from square one to get her even into the building.

N.T., 4/10/25, at 53.

Ms. Butler testified that, while Mother's visits with Child were supposed "to be weekly," by June of 2024, Mother's visits had not "even been monthly" and, aside from one "20 to 30 minute separation from [A.J.J.,]" Child refused

to engage with Mother without A.J.J. present. ***Id.*** at 53-54; ***see also id.*** at 137 (reflecting A.J.J.'s testimony that, other than one period of "about 20 minutes," she was not able to leave Child in the room with Mother).

Ms. Butler explained that during the visits, Mother generally made "very little conversation" with Child and the conversations Mother had with Child "were just very brief and what I would describe as surface level[.]" ***Id.*** at 54, 61. Ms. Butler described an "awkward moment" that occurred during the May 8, 2024 visit, in which Mother "picked up [Child], said [`]mommy loves you,[']" while Child "was struggling to get down out of the hug, and [Mother] held onto her to keep her there." ***Id.*** at 24, 27. Ms. Butler explained that the interaction also illustrated that Mother did not understand how confusing it was to Child when Mother referred to herself as Child's "mommy." ***Id.*** at 27. At the conclusion of the last visit on June 19, 2024, Ms. Butler testified: "I could see [Child] was – I don't know if I would say happy, but much calmer, more relaxed, like I would say she was visibly relieved that she was able to go home." ***Id.*** at 54.

With regard to Mother's ability to form an attachment with Child, Ms. Butler testified that she did not observe Mother ask Child questions about her interests or her life, nor did Child "reach out to [Mother] to meet her needs during any of the[] visits[]"; rather, "[Child] would consistently go to [A.J.J.] for any need[.]" ***Id.*** at 56-57. Ms. Butler also testified that she never observed A.J.J. discourage Child from seeing Mother; rather, A.J.J. "was always accommodating to be available for visits." ***Id.*** at 55-56. Ms. Butler

testified that she did not observe any indication of Child's attachment to Mother during the visits. *Id.* at 59.

Dr. Braelyn Tracy, a licensed psychologist, testified as an expert witness in the field of "child psychology," as well as a fact witness. *Id.* at 64. Dr. Tracey testified that in June of 2023 she commenced treatment of Child to address "[b]ehavioral challenges that she was having due to trauma that she experienced." *Id.* at 66. Dr. Tracy explained that she initially saw Child on a monthly basis to provide "trauma informed care" and also "parent/child interaction therapy" (PCIT) for Child and A.J.J. *Id.* at 65-67, 70. After June of 2024, Dr. Tracey's sessions with Child and A.J.J. became more frequent, occurring every two to three weeks. *Id.* at 66-67. Dr. Tracy testified that A.J.J. "provided a history" of Child's behaviors, including "[e]xcessive tantrums, disattachment with parents or caregivers, defiance, oppositional, poor impulse control, and there was some social and emotional delays as well[,]" and that Child had a diagnosis of "reactive attachment disorder." *Id.* at 67. Specifically, Dr. Tracy explained that the disorder "can only be caused by trauma[,]" describing it as "basically the childhood diagnosis of PTSD[,]" and that the disorder "makes it hard for [Child] to develop relationships with peers and other individuals." *Id.* at 82, 84. In addition to language and communication delays, Dr. Tracy testified that Child also had "a sensory processing issue" and needs "very regular consistent treatment and intervention clinically[.]" *Id.* at 73-74.

Dr. Tracy testified that Child "was doing really well" after almost a year of therapy and that Child was "engaging in the treatment process" and "making a lot of progress with [] our [therapeutic] relationship[,]" but then Child "started to have excessive tantrums again[]" around September of 2024 and "she completely disengaged our therapeutic relationship[.]" *Id.* at 68-70; *see also* Ex. 2, Dr. Tracy's Rpt., at 2 (unpaginated). Dr. Tracy attributed the change in Child's behavior to "supervised visitations with her biological mom at ACES, and I know that they were having a hard time conducting those[]" and opined that Child's therapy was "definitely impacted by that." N.T., 4/10/25, at 69; *see also* Dr. Tracy's Rpt. at 2. Dr. Tracy testified that in June or July of 2024, ACES asked her opinion as to whether it was "a good idea to discontinue [Child's] visits" with Mother. N.T., 4/10/25, at 72. Dr. Tracy recommended that visits with Mother be discontinued because Child was "showing signs of regression" and Dr. Tracy had concerns about "re-traumatization." *Id.*

Dr. Tracy described Child as "perceptive and intelligent" and able to "read the room[.]" *Id.* at 113. Dr. Tracy explained that Child "feels safe and secure with [A.J.J.]"; specifically, A.J.J. was "the only person that can calm [Child] down in my office." *Id.* at 77-78, 110. Dr. Tracy testified that Mother never reached out to her about Child's treatment, that Child "never . . . referenced [Mother] . . . at all in any of our sessions[,]" and that Child's "biological parents are essentially strangers to her." *Id.* at 79, 111, 114.

In describing Child's reactive attachment disorder, Dr. Tracy explained that "attachment [of a child to a person] is formed at a very young age, and so trying to introduce and create an attachment at a later age, would cause [Child] a lot of confusion and be detrimental to her psychological wellbeing." *Id.* at 103. Dr. Tracy testified that Child's caregiver or parent would need to be "child-focused[,] as opposed to self-focused[,]" cognizant of Child's conditions, and able to "learn the skills to provide for [Child,]" such as to encourage Child "into more socially acceptable behavior[.]" *Id.* at 106-107. She further described Child as a child who "does best" and "thrives off her structure and routine[,]" and opined that Child required a caretaker with "not only empathy, but patience and . . . that gentle parenting approach[.] *Id.* at 81, 86.

Dr. Tracy further opined that depriving Child of her bond with A.J.J., or forcing Child to attempt to form an attachment to Mother, would "be detrimental to [Child], [] because of how much of an attachment she has to [A.J.J.]" and would be "incredibly confusing and disrupt . . . the attachment or connection [Child] has with [A.J.J.]" *Id.* at 109-10. She furthermore opined that continuing to attempt to establish an attachment or bond between Child and Mother would "impact [Child's] pathogenic process and never let her heal[,]" potentially leading to "severe personality disorder," "ongoing trauma[,]" and "unhealthy attachments and relationship styles." *Id.* at 110-11.

Dr. Tracy stated that, in her professional opinion, "no contact [with the biological parents] is crucial for [Child's] development[]" to avoid Child "becoming re-traumatized or . . . continuing to regress developmentally[,]" because the "biological parents . . . cannot provide [a] healthy, stable, safe environment for [Child,]" whereas Child has "formed such an attachment to [A.J.J.]" *Id.* at 84-85; *see also* Dr. Tracy's Rpt. at 3-4.

A.J.J. testified that she resides with her husband, W.A.J., Jr., and their three children aged nine to fifteen years' old. *See* N.T., 4/10/25, at 123. She explained that the Agency had placed Child in her care, as a kinship foster parent, when Child was about six months old. *Id.* During the approximately two-year period that Child's dependency case was open, A.J.J. testified that the Agency had never recommended that Child be reunified with Mother nor for Mother to progress from supervised to unsupervised visits with Child. *Id.* at 129-30.

A.J.J. described Child as having special needs and requiring structure, routine, and predictability and that Child would have "complete meltdowns," but that a "gentle parenting" approach, as suggested by Dr. Tracy, helped to reduce these behaviors. *Id.* at 138-41. For example, A.J.J. testified that while Child has speech delays she is able to say, "I'm sad," or "I'm mad," and sometimes Child was able to explain why she felt that way but other times expressed herself through "act[ing] up[,]" and that "it takes you talking to her and having a relationship with her" to encourage Child to communicate her emotions verbally. *Id.* at 151-53. A.J.J. testified that Child required a

caretaker with "a pretty high level of empathy for what she's going through." *Id.* at 152.

A.J.J. described Child as even more attached to her than usual after the supervised visits with Mother. *Id.* at 137-38. During the period of supervised visitation from December of 2023 to June of 2024, A.J.J. testified that Child developed troubling behaviors such as biting herself and banging her head against the wall and that these behaviors improved after the supervised visits stopped. *Id.* at 140-42.

A.J.J. further testified that Mother would send text messages to A.J.J. "constantly" and that "[a] large percentage" of these messages consisted of Mother saying, "How is [MY], capital letters, daughter?" and Mother referring to herself as Child's "one and only mom." *Id.* at 145, 161-62, 175. A.J.J. testified that shortly after entry of the SPLC agreement, sometime between March and June of 2023, she had filed a Protection From Abuse (PFA) petition against Mother due to Mother's threats of abuse and that, after a temporary PFA order was entered, Mother texted A.J.J. about Child less frequently and Mother did not send texts as much "late at night" or "in the middle of the night[.]" *Id.* at 162-63, 175-76.

A.J.J. further testified that her household had experienced approximately eight police welfare checks "late at night or in the middle of the night[,]" where police asked specifically about Child's welfare, requiring A.J.J. to wake Child up "so that a police officer can make sure she's safe[.]" *Id.* at 145-46. A.J.J. testified that none of these welfare checks resulted in adverse

actions against A.J.J., such as criminal charges or referrals to the Agency. *Id.* at 172.

Describing her circumstances at the time of the TPR hearing, Mother testified that, "I have my own place. I work. I have a job. [] I have a great [] income. [] I have transportation." *Id.* at 202. Regarding the supervised visits with Child at ACES, Mother testified that "[t]here were [] a couple of times where they were great" and that there were "no problems," but at "other times, the supervisor would not make [A.J.J.] leave[.]" *Id.* at 189. Mother in her testimony speculated that, had A.J.J. actually left during these visits, Child "would have freaked out probably like a couple of minutes, and then she would have been fine" and asserted that "I know my daughter very well." *Id.* at 190, 216, 219. Mother denied forcibly hugging Child at the end of a visit. *Id.* at 217. Mother testified that, during the visit at which she had brought gifts for Child, she and Child "joked around" and Child smiled and laughed. *Id.* at 195. Mother explained that she attended only six supervised visits with Child at ACES because, although she received a grant to cover the cost of the visits, she was unable to "find [] a ride" and that "money was hard for me[,]" and that she did not currently have a car. *Id.* at 193-94, 202-03, 222, 238.

Mother described A.J.J. as "psychotic," blamed "Child's problems" on A.J.J., and testified that Child has "hundreds of [] bruises and red marks on her . . . in [A.J.J.'s] care[.]" *Id.* at 204-05, 235. Mother admitted that she called police for welfare checks on Child approximately five times because "[s]ince [A.J.J.] would not reply back to me for like a long time, I was worried

and concerned [] about [Child]." *Id.* at 202, 227.[5] When asked what parental duty Mother had performed for Child since March of 2023, Mother testified that, "[s]ince [A.J.J.] has been [] ignoring me, not [] letting me see [Child] or [] anything, [] I've done just [] not one thing because of her." *Id.* at 232-33.

Attorney Elliott-Rentler testified regarding her observations while serving as GAL in Child's custody case. Attorney Elliott-Rentler opined, based in part on her observations of interactions between Child and Mother during the ACES' supervised visits, that "there has been no meaningful relationship" between Mother and Child "for an indeterminate period of time." *Id.* at 284. Further, Attorney Elliott-Rentler opined that Mother had performed no parental duties for Child in the past approximately two years, including during play time at the supervised visits. *Id.* at 281, 284.[6] Attorney Elliott-Rentler ultimately opined, based in part on Dr. Tracy's predicted "very, very bleak" effect on Child of continuing to attempt to "reintroduce [a] relationship" with Mother, and "considering [Child's] developmental, physical and emotional

_____

[5] In response to Petitioners' counsel's question on cross-examination about why Mother called the police to conduct welfare checks on Child "in the middle of the night[,]" Mother answered: "[If A.J.J. is] not going to reply to a message, she's not going to pick up a phone, that will last longer, plus, she has three kids of her own. She works." *Id.* at 228. Mother also testified on cross that, "I do not [] harass people. . . . I'm probably the closest thing to [a perfect mother.]" *Id.* at 232.

[6] Specifically, Attorney Elliott-Rentler testified: "There have been no parental duties performed by [Father] in almost two years and by [Mother] in a similar period of time, even during the visits, and it was play time. And that was appropriate in the burgeoning visits that [Mother] was having." *Id.* at 284.

needs[,]" that terminating Mother's rights would be in Child's best interests. *Id.* at 285-86.

On May 22, 2025, the trial court entered an order terminating Mother's parental rights pursuant to Sections 2511(a)(1) and (b) of the Adoption Act. *See* Trial Ct. Op. & Order, 5/22/25, 18-20. Mother filed a timely notice of appeal and both Mother and the trial court complied from Pa.R.A.P. 1925.

On appeal, Mother raises the following issues:

1. Whether the [] trial court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Mother under 23 Pa.C.S. § 2511(a)(1).

2. Whether the [] trial court erred in finding by clear and convincing evidence that the moving party met its burden under 23 Pa.C.S. § 2511(b) that the best interests of [] Child are met by terminating Mother's parental rights.

Mother's Brief at 4 (some formatting altered).

## Section 2511(a)(1)

In her first claim, Mother contends that the evidence was insufficient to establish that she relinquished her parental claim or failed to perform her parental duties for Child. *Id.* at 14-15. Specifically, Mother argues that she "visited with [] Child six times during the six months immediately preceding the filing of the [TPR] petition . . . [and had] obtained suitable housing [and] ha[d] several jobs[.]" *Id.* at 15 (some formatting altered). Mother asserts that during the supervised visits with Child, she "got on the floor and played with [] Child[,] brought appropriate food and toys[,]" and "actively engaged

with [] Child and never yelled at [] Child." *Id.* at 19-20, 22. Mother contends that she "was limited by circumstances beyond her control in how much parenting she could do for [] Child." *Id.* at 17. Specifically, Mother argues that the supervised visits "were unilaterally stopped by [ACES]" and, further, that A.J.J. prevented Mother from accessing Child to exercise her "parental rights and to attempt to parent [] Child." *Id.* at 18. In addition, Mother asserts that she "did not have the financial means to get to some of her visits." *Id.* at 20.

Further, Mother argues that the evidence did not support the trial court's finding that she "failed to perform parental duties for at least six months prior to the filing of the [TPR] petition" but, rather, that she "did everything in her power to parent [] Child within the limits of the custody court's order." *Id.* at 15-16 (some formatting altered). Mother asserts that she "was limited by circumstances beyond her control in how much parenting she could do for [] Child[,]" such as "the lack of access [to Child] provided by [Petitioners]." *Id.* at 17-18. Mother contends that she "made efforts to perform her parental duties" in that she "visited with Child right up until the month that the [TPR petition] was filed[;] had suitable housing for [] Child." *Id.* at 19. Mother claims that she "credibly explained that she did not have the financial means to get to some of her visits, even though she did have funding assistance to pay for the supervisor's services[]" and visited "as much as she could." *Id.* at 20.

In reviewing challenges to the termination of parental rights, we assess whether the order below

is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a [TPR petition], a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, . . . the moving party [must] establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations omitted and some formatting altered).

Section 2511(a)(1) of the Adoption Act (the Act) provides:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition

- 18 -

either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

Our appellate courts have described 'parental duties' in the context of

Section 2511(a)(1) as

best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, . . . the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert h[er]self to take and maintain a place of importance in the child's life. Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. . . . Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

\* \* \*

[T]he [trial] court must consider the non-custodial parent's explanation, if any, for the apparent neglect. . . . Although a parent is not required to perform the impossible, [s]he must act affirmatively to maintain h[er] relationship with h[er] child, even in difficult circumstances. A parent has the duty to exert h[er]self, to take and maintain a place of importance in the child's life.

Thus, a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. A parent cannot protect h[er] parental

- 19 -

rights by merely stating that [s]he does not wish to have h[er] rights terminated.

*In re B., N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004) (citations omitted and some formatting altered).

In deciding whether a petitioner has established the grounds set forth in Section 2511(a)(1), "the trial court must focus on the parent's conduct and avoid using a balancing or best interest approach." *M.E.*, 283 A.3d at 830 (citation omitted and some formatting altered). However, once "the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under [Section] 2511(b) [of the Act], which focuses on the child's needs and welfare." *Id.* (citation omitted).

Here, the trial court explained:

Mother failed to undertake any parental action for the benefit of [C]hild's general wellbeing and did not perform any parental duties. [Petitioners] were not obstructive to Mother in performing parental duties. [Petitioners] continued taking [C]hild to the sporadic supervised visits with Mother despite [C]hild becoming upset and emotional during the visits and having regressive behaviors after. During every visit, [A.J.J.] made numerous attempts to leave so that [C]hild and Mother could interact but was unable to do so because of the reaction of [C]hild. Mother's visits ended after it was determined that continuing would be detrimental to [C]hild.

Trial Ct. Op. & Order, 5/22/25, at 13-14.

Following our review of the record, we discern no abuse of discretion and conclude that the trial court's findings are supported by the record. *See M.E.*, 283 A.3d at 829-30; *B., N.M.*, 856 A.2d at 855-56.

The record reflects that Child was approximately four months old when she was removed from Mother's care and six months old when she was placed with Petitioners. ***See*** Trial Ct. Op., 5/22/25, at 2. In March of 2023, when Child was approximately two and a half years old, the trial court awarded custody of Child to Petitioners pursuant to the SPLC, rather than returning Child to Mother and/or Father's care. ***See id.*** Child was just shy of four years old when Petitioners filed the TPR petition and aged four years and eight months at the time of the TPR hearing. ***See id.*** at 1-2. The record reflects that at no time after Child was removed from Mother's care has Mother provided for Child's physical and emotional needs. As described by Dr. Tracy, Ms. Butler, and A.J.J., Child has special needs and requires a caregiver who understands these needs and interacts appropriately with Child. ***See*** N.T., 4/10/25, at 47-59, 64-86, 103-14, 137-56; ***see also*** ACES Rpt.; Dr. Tracy's Rpt.

We note that in the six months before the TPR petition was filed, Mother had the right and the funding to exercise thirty-five supervised visits with Child. ***See*** Trial Ct. Op. & Order, 5/22/25, at 1-2, 13. Those supervised visits were a pathway for Mother to begin to re-establish a parent-child relationship with Child. However, Mother only attended six of these visits, which we note is about seventeen percent of the available visits. ***See id.*** at 13. Although Mother has consistently claimed that she had the means to perform or could have performed parental duties for Child, she also testified that she failed to perform parental duties because she did not have the means to pay for

transportation for visits with Child. *See* N.T., 4/10/25, at 187-88, 193-94, 202-03, 222, 238. The record clearly establishes that Mother's conduct fell short of acting "affirmatively to maintain h[er] relationship with [Child], even in difficult circumstances[,]" or exerting herself "to take and maintain a place of importance in [Child's] life." *B., N.M.*, 856 A.2d at 856. Accordingly, the trial court did not err or commit an abuse of discretion in finding grounds for termination under Section 2511(a)(1) and Mother is not entitled to relief on this claim. *See M.E.*, 283 A.3d at 829-30.

### Section 2511(b)

Mother also claims that Petitioners failed to establish by clear and convincing evidence that termination of Mother's parental rights was in Child's best interests. Mother's Brief at 4, 22-27. Because Dr. Tracy never observed any of the visits between Mother and Child, Mother characterizes Dr. Tracy's opinion testimony as based on "reports of other[] persons[.]" *Id.* at 9 (citing N.T., 4/10/25, at 90-91). Mother contends that A.J.J. conceded, upon receiving legal custody of Child in 2023, that A.J.J. denied Mother visits with Child even though "neither [the Agency] nor any professional counselor or therapist advised [A.J.J.] to not allow visits with Mother." *Id.* at 10 (citing N.T., 4/10/25, at 158-59). Mother challenges Dr. Tracy's opinion, that "there can never be a bond between Mother and [] Child[,]" on the basis that Dr. Tracy never personally observed Mother with Child and, further, lacked information about "Child's life between the ages of six months to three years of age." *Id.* at 26. Mother characterizes Dr. Tracy's testimony as inconsistent

because Dr. Tracy "blame[d] Child's alleged regression in her behaviors in the summer of 2024 to visits with [] Mother[]" but had also testified that "Child is still in the regression stage" at the time of the TPR hearing when, in fact, Mother's supervised visits with Child at ACES occurred "between December 30, 2023 through June 19, 2024." *Id.* at 26-27.

Additionally, because Child was "not in the dependency or foster system[,]" Mother argues that Child's life would "not be altered in any way by a reversal of the termination order." *Id.* at 25 (some formatting altered). Mother concludes that Mother and Child share a "connection . . . that cannot be terminated . . . without further reunification efforts." *Id.* at 27.

Section 2511(b) provides:

> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Our Supreme Court described the Section 2511(b) inquiry as one where the trial court must consider

> the child's need for permanency and length of time in foster care . . .; whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including

- 23 -

intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs. *See* [*In re T.S.M.*, 71 A.3d 251, 268-69 (Pa. 2013)] ("[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved."). Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

*In re K.T.*, 296 A.3d 1085, 1113 (Pa. 2023) (footnotes omitted and some formatting altered).

Here, the trial court explained:

[C]hild has been with [Petitioners] for over four years, during which they have provided for all of her needs. . . . [C]hild's behavior during her visits with . . . Mother clearly demonstrates that she has no attachment or bond to [Mother] and turns to [A.J.J.] for comfort. . . . Ms. Butler testified that she did not observe any bond between [C]hild and [] Mother during the supervised visits. . . . Further, Dr. Tracy testified that there is a bond between [C]hild and [A.J.J.] . . . [and opined] that no such bond existed [between Child and Mother] based on her understanding of [C]hild's behavior during the supervised visits.

Trial Ct. Op. & Order, 5/22/25, at 17.

Following our review of the record, we discern no abuse of discretion and conclude that the trial court's findings regarding Section 2511(b) are supported by the testimony and evidence set forth by Petitioners. *See M.E.*, 283 A.3d at 829-30. The record contains overwhelming evidence that Petitioners were best positioned to meet Child's "developmental, physical, and emotional needs, including intangible needs of love, comfort, security, and stability[]" and, aside from Mother's bald assertions, the record is devoid of

evidence that Mother could meet those same needs. *See K.T.*, 296 A.3d at 1113. The record also clearly supports the trial court's conclusion that Child does not share a bond with Mother. Accordingly, we discern no abuse of discretion or error of law in the trial court's conclusion that termination was in Child's best interests under Section 2511(b). *See id.* Therefore, Mother is not entitled to relief on this claim, and we affirm the order terminating Mother's parental rights.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 1/22/2026